**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| HAMSTEIN CUMBERLAND MUSIC GROUP, HOWLIN' HITS MUSIC, INC., HAMSTEIN CUMBERLAND MUSIC COMPANY, B. H. ASSOCIATES, INC., D/B/A HAMSTEIN MUSIC COMPANY, and BILL HAM, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.  06-cv-63-GKF-PJC |
| v. | ) ) | |
| ESTATE OF JERRY LYNN WILLIAMS and LORELEI WILLIAMS, | ) ) ) | |
| Defendants. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case was tried to the court without a jury.  The plaintiffs claim songwriter Jerry Lynn Williams fraudulently transferred assets to his wife, defendant Lorelei Williams, using a consent divorce property settlement with the intent to hinder, delay, or defraud the plaintiffs as creditors in violation of the Oklahoma Uniform Fraudulent Transfer Act, OKLA. STAT. tit. 24, §§ 112-123.  *See* Amended Pretrial Order, Dkt. 289, ¶ I.  Plaintiffs Hamstein Cumberland Music Group, Howlin' Hits Music, Inc., Hamstein Cumberland Music Company, B. H. Associates, Inc., d/b/a Hamstein Music Company, and Bill Ham were present and represented by S. Douglas Dodd and William H. Spitler of Doerner, Saunders, Daniel & Anderson, L.L.P., and Lawrence A. Waks of Jackson Walker, L.L.P.  Defendant Lorelei Williams was present and represented by Paul D. Brunton and James R. Hicks of Morrel Saffa Craige, P.C.  Defendant Estate of Jerry Lynn Williams was present through its Special Administrator Robert S. Farris and was represented by William R. Grimm of Barrow & Grimm, P.C.

Based upon the evidence presented by the parties and the arguments of counsel, the Court enters the following findings of fact and conclusions of law.


## **FINDINGS OF FACT**

1.      Hamstein Cumberland Music Group is a Tennessee general partnership, with its principal place of business in the State of Texas.  None of the partners of Hamstein Cumberland Music Group is a citizen of Oklahoma.

2.      Howlin' Hits Music, Inc. was a Texas corporation with its principal place of business in Texas.  However, prior to the filing of this lawsuit, it was merged into Hamstein Cumberland Music Company LLC.

3.      Hamstein Cumberland Music Company, Inc., now Hamstein Cumberland Music Company LLC, is a Tennessee limited liability company with its principal place of business in Texas.

4.      B. H. Associates, Inc., d/b/a Hamstein Music Company, now B. H. Associates, LLC, doing business as Lone Wolf Productions, is a Texas limited liability company with its principal place of business in Texas.

5.      Bill Ham is an individual who resides in the State of Texas.

6.      Plaintiff companies are involved in the music and entertainment business in the areas of artist management, music publishing and production.  Bill Ham is the owner and officer of the plaintiff companies.  The plaintiffs are referred to collectively herein as "Hamstein."

7.      Defendant Lorelei Williams ("Ms. Williams" or "Lorelei") is an individual who resides in Tulsa County, State of Oklahoma.

8.     Jerry Lynn Williams ("Mr. Williams" or "Jerry") was a songwriter of some notoriety having written songs for a number of notable artists including Eric Clapton, Bonnie Raitt, and B.B. King.  His last known address in the United States was in Tulsa County, Oklahoma. Williams died on November 25, 2005 in St. Maarten, Netherlands, Antilles.  Administration of his probate estate is pending in Case No. PB-06-254, District Court of Tulsa County, Oklahoma. Robert S. Farris, Esq. is the court-appointed Special Administrator of the probate estate.

9.     Lorelei and Jerry met in Malibu in 1985, after which they began dating.  Lorelei divorced her second husband in July, 1987.  Lorelei and Jerry were married in 1988 in Cabo San Lucas, Mexico.  They lived together until approximately June 2003.  They were divorced on May 31, 2005.

10.     Hamstein had a significant music publishing business handling up to 10,000 copyrights during the period between the late 1980's until December, 2001.  Music publishing involves "exploiting" a composition to the extent it produces as much revenue as possible, for example by getting a song recorded by a major recording artist.  An element of the music publishing business is "administration," the function focused on collecting royalties and accounting and paying to songwriters their share of the revenues generated by the compositions.

11.     Effective January 1, 1989, Williams and Hamstein entered into a co-publishing agreement in which Hamstein was the administrator.  The co-publishing agreement was for a one-year term with four one-year term options, each of which was exercised by Hamstein.  This Agreement terminated pursuant to its own terms at the end of 1993 and the parties entered into another co-publishing agreement dated January 1, 1994, effective until December, 1998. Williams wrote several hundred songs during his relationship with Hamstein.  The relationship between Williams and Bill Ham was once very close.  Witness Mike Griffin, an officer and

independent consultant with Hamstein, testified that "it would even be understating it to say that they were like brothers . . ."

12.     In an Agreement dated February 5, 1997, Polygram International Inc. and Songs of Polygram International, Inc. purchased the rights to approximately 80 songs, administered by Hamstein, from Jerry Williams for an amount in excess of $2,600,000.00 and Hamstein relinquished the rights to administer those songs.

13.     By 1998, the relationship between Hamstein and Williams had "seriously deteriorated." Hamstein ultimately brought a civil action in the U.S. District Court for the Western District of Texas, Austin Division, No. A 99-CA488 JN alleging breach of the 1994 Agreement.

14.     Hamstein and Williams executed a Final Settlement Agreement and Mutual Release effective March 31, 2000, whereby Hamstein paid Williams a Settlement Payment in the stated sum of $2,100,000 and conveyed "all Hamstein's rights, title and interest in and to each and every composition delivered by, conveyed, sold or transferred by Williams to Hamstein from January 1, 1989 to [March 31, 2000]." Williams waived his rights to certain royalties defined in ¶ 1.2. The Settlement Agreement gave the parties audit rights in ¶ 1.4, and included a mandatory arbitration provision in ¶ 5.6. Beginning in the fall of 2001, Hamstein began sending audit notices in an attempt to audit Williams in connection with the royalties he received. Hamstein attempted to audit Williams for a little over a year, but was unsuccessful.

15.     On December 13, 2002, Hamstein commenced an arbitration proceeding relating to Williams' alleged failure to account for and pay to Hamstein domestic and foreign royalties pursuant to the Final Settlement Agreement of March 31, 2000. Williams was angry about the Hamstein arbitration proceeding and did not cooperate in the arbitration process.

16.     On February 18, 2003, Williams, by and through attorney Ward, filed suit in the state district court in Tulsa County, Oklahoma, Case No. CJ-2003-1141. Among other things, Williams sought declaratory relief determining that the arbitration provision of the Final Settlement Agreement was procured by fraud and unenforceable. Hamstein removed the case to this court on April 2, 2003, and filed a motion to dismiss. This court dismissed the case for improper venue. *See* Case No. 03-cv-224 in the U.S. District Court for the Northern District of Oklahoma.

17.     Pursuant to Williams' direction, a Tulsa attorney, Keith Ward, Esq., filed a legal malpractice lawsuit in Austin against Williams' former lawyers, Mithoff & Jacks, L.L.P., alleging that the firm "did not document what [Williams] believed to be the settlement in a manner that [Williams] believed was the actual terms of the settlement" and "left [Williams] vulnerable to claims being asserted against him by Hamstein." Ward testified the case was no longer pending.

18.     On March 11, 2003, Hamstein filed suit in federal court in Austin, Texas, to compel Williams to arbitrate. *See* Case No. 03-cv-148 in the U.S. District Court for the Western District of Texas. Williams was served and filed an answer on April 22, 2003. On August 15, 2003, the Court granted an Order compelling Williams to arbitrate and enjoined Williams from prosecuting the Oklahoma action against Hamstein.

19.     In June 2003, Williams moved to St. Martin, French West Indies and later moved to the Dutch side of that island, St. Maarten, Netherlands Antilles. Williams spent the last two and a half years of his life on the island and never returned to Oklahoma.

20.     In June 2003, Williams engaged an attorney in Anguilla, British West Indies, Keithley Lake, to form an Anguillan offshore company, an IBC (International Business Corporation),

called Platinum Parrot Corporation ("Platinum Parrot"). Williams told Lake that funds were going to be forthcoming from an English group from a music catalogue deal Williams had done in the UK. Williams also told Lake that an individual by the name of Hamstein had been hounding him forever and had done Williams a great injustice and Williams was not going to take it anymore. Williams said he had paid Hamstein enough money and he didn't want Hamstein to have any further access to his funds. Lake assured Williams that there was no way the funds could be attacked if the company was set up correctly.

21.     On June 3, 2003, around the time of Williams' move from Oklahoma to the Caribbean, he entered into an assignment of copyrights of 83 of his songs to Stage Three, Ltd. of London, for $1,400,000.00. The evidence before this court is that Jerry received net sale proceeds of approximately $1,200,000.00.

22.     Based upon testimony from Williams' former attorney, Keithley Lake, Esq. of Anguilla, Williams was "very passionate" about keeping his assets out of Hamstein's hands. Williams' former attorney Keith Ward, Esq. of Tulsa, and his friend Carl Vaughan, III, confirmed in their testimony that Williams was focused upon protecting his assets from Hamstein.

23.     On September 7, 2003, at Jerry's request, Lorelei sent a fax from Jerry's residence in St. Martin, French West Indies containing an eight page list of nearly 400 of Jerry's songs to Keithley Lake stating "These songs need to be protected. There is only an administration agreement with another London Co. There [sic] purpose is to collect royalties and get this group of songs covered by artists, movies, etc – for a percentage." Lorelei testified that the songs needed to be protected from "the World." The eight page list faxed to attorney Lake is the same list later appended as Exhibit "B" to the consent Divorce Decree entered May 31, 2005, whereby Lorelei received all rights to the listed songs.

24.    Between June 2003 to February 19, 2004, Williams had wired Lorelei over $290,000.00. Lorelei testified that after February, 2004, Jerry "pretty much" stopped paying her bills, although "there may have been a little bit of money that came to me after that." Lorelei testified she had no source of revenue whatsoever, but the record proves she made $86,200 in currency deposits of $9,000 or less per deposit in the time from July of 2004 to July of 2005. She testified the cash deposits came from her other bank accounts, but she didn't know which ones. Ms. Williams' testimony in that specific regard is not credible. Moreover, Ms. Williams' testimony in response to the questions of plaintiffs' counsel and the Special Administrator's counsel was non-responsive and reflected a failure of recall on many points. The court concludes Ms. Williams' testimony was not credible with respect to the issues of fraudulent transfer.

25.    Lorelei testified that beginning in the Spring of 2004 while she was living in Leonard, Oklahoma, she began to suspect that Jerry was being unfaithful to her. In May, 2004 she engaged a private investigator in St. Maarten to report on Jerry's activities.

26.    In April of 2004, Williams told his Tulsa attorney, Keith Ward, he was considering getting a divorce. Williams told Ward he had a French girlfriend and that he wanted to get married and have a baby.

27.    By September 9, 2004, Williams had spent the vast majority of the net sale proceeds from Stage Three, Ltd., including monthly cash transfers totaling $292,263.71 to Lorelei by February 19, 2004, payment of $101,791.54 for outstanding loans secured by vehicles to Community Bank and Trust of Tulsa and the purchase of a 63 foot yacht--*The Urge*--for $422,005.55. Williams later ran the boat aground, ruining one of the two engines and significantly lowering its value.

28.    The record before this court shows Williams' only significant income from June 2003 until his death in November 2005, to have been one-half of his and Lorelei's Cherokee County

ranch sale proceeds in the sum of $150,517.93 in September 2004. Lorelei received the other half of the ranch sale proceeds.

29.     Lorelei testified she began talking with Jerry about the possibility of divorce in the late summer or early fall of 2004. She consulted with Tulsa attorney Mark Lassiter in September 2004 about a possible divorce action.

30.     On December 16, 2004, the arbitrator awarded Hamstein $500,000.00 in attorneys' fees as sanctions for Williams' failure to respond to discovery. On December 28, 2004, the arbitrator entered an amended *nunc pro tunc* order granting the same sanction.

31.     On December 29, 2004, Hamstein filed a Complaint and Application to Confirm Arbitration Award in the United States District Court for the Western District of Texas (Case No. A-04-CA-1097-SS).

32.     On January 7, 2005, Williams sent an email to his attorney Keithley Lake's office in Anguilla seeking the transfer of all his assets to hide, hinder and shield them from Hamstein's arbitration award. The email, to that end, reads in pertinent part:

> I do need to seriously talk to Keithley now, because the Judge in Austin, has given the fool that stole all that money from me, a 500K possible reward if I don't produce some papers that I was never given in the first place! **So I need to seriously now consider immediate action to place all my holdings of any value, Into Platinum Parrott! My cars, my half of the house there, my studio, all my songs, everything, and right away! I just need to know the procedure too do so! Even contract myself to PP, so that any further earnings in the future will go too PP! Like I've borrowed a large sum of money from PP and have placed all these items as collateral! Or whatever! Keithley needs to very carefully, explain to me how this is done, and what exactly I have too do to make it happen right away! I have to backdate the work, as to make it look like it all took place before any of the actions that have taken place in this suit that is pending!** [emphasis added]

33.     Seven days later, on January 14, 2005, Williams emailed his Tulsa lawyer, Keith Ward, on the "Subject" of "Re: Hamstein."  The email states, in pertinent part:

If I had 20K to spend, do you not think I would not have spent it?...**Let me ask you something! What if Laura and I file for a divorce, and tie up everything in the divorce settlement, or if I file for bankruptcy! Would that help!** . . . I don't agree with them serving you on this matter! **That's why I moved out of the country so he would have to serve me here! But they do not know where here is! And if they served me here, they can only win 40K tops!** [emphasis added]

34.     Ward and Williams discussed Williams' desire to protect his assets.  Mr. Ward testified that he advised Williams that neither a divorce nor a bankruptcy, if done with intent to hinder or delay creditors, would be effective in shielding assets.

35.     Williams' friend Carl Vaughan testified, and this court finds, that the award, and how to get out from under it, was the foremost thing on Jerry's mind. Williams said he needed to file for bankruptcy or do something about the large Hamstein award outstanding against him. At one point Williams said he needed to get a divorce to help avoid the judgment.  From his conversations with Williams, Carl Vaughan formed the belief Williams had arranged his divorce in part to avoid the consequences of the large award outstanding against him.  Vaughn understood that Williams believed he could shield his assets from the arbitration award through the divorce procedure.

36.     On February 8, 2005, the Court Clerk for the United States District Court for the Western District of Texas filed an Entry of Default against Williams in Case No. A-04-CA-1097-SS.

37.     On February 18, 2005, Williams wrote a personal letter to United States District Judge Sam Sparks.  Williams stated he "had no knowledge of my attorney [Ward] not handling the issues of Civil Case # A04CA1097SS until yesterday . . ."  Williams stated he "did not know the extent of the attorneys [sic] mishandling of the case until today" and asked to be allowed to address the issues with his new attorneys.  The Court filed and docketed the letter on February 22, 2005.

38.     On February 22, 2005, Williams' new attorneys, Hearne & Browder, LLP of Austin, Texas, filed a Motion to Set Aside Default and To Extend Deadline for Filing Response to Plaintiff's Original Complaint.

39.     On February 24, 2005, United States District Judge Sam Sparks confirmed the arbitrator's Amended Nunc Pro Tunc Order Granting Hamstein's Motion to Compel and Sanctions, and granted Hamstein's Motion for Entry of Default Judgment.  The Judgment was entered the next day, on February 25, 2005, in the amount of $500,000 plus interest.

40.     On February 25, 2005, the Court set Williams' Motion to Set Aside Default and To Extend Deadline for Filing Response to Plaintiff's Original Complaint for hearing on March 4, 2005 at 1:30 p.m.

41.     On March 4, 2005, Judge Sparks held a hearing in Austin on Williams' Motion to Set Aside Default (the "March Hearing").  Mr. Williams was not present.  However, Ms. Williams, who was neither a party to the arbitration nor a party to the lawsuit to confirm the arbitration award, was present.

42.     Ms. Williams was not simply present as an uninterested observer.  Williams' lawyer, Paul Browder, told Judge Sparks ". . . *Ms. Williams is here to testify that she did talk to the attorney and understood that he was going to file an answer and he was going to appear in this case. And so, under those circumstances they* [Mr. and Ms. Williams] *believed that this issue was being handled."*

43.     At the March Hearing, Judge Sparks denied Williams' motion to set aside the interlocutory default and ordered the parties to complete the then-pending arbitration within 120 days.  The Court further stated that "whatever Judge Meyers [the arbitrator] does on the

arbitration, I'll enter that as a final judgment." Judge Sparks entered a written order on March 10, 2005.

44.     Immediately following March Hearing, Ms. Williams spoke with Mr. Williams for 13 minutes, according to her telephone records.  Over the next two months, Ms. Williams had numerous telephone communications with Mr. Williams and his attorneys, Hearne & Browder.

45.     By March 4, 2005, if not before, Ms. Williams was aware of the initial arbitration sanctions award entered in favor of Hamstein and against Mr. Williams in the amount of $500,000.00, as well as the interlocutory default judgment entered in federal court confirming the initial arbitration sanctions award.

46.     Following her attendance at the hearing on March 4, 2005, Ms. Williams was aware that Mr. Williams' arbitration action with Hamstein had to be concluded by July 3, 2005 and that Judge Sparks had said he would confirm whatever the arbitrator decided.

47.     On April 29, 2005, Ms. Williams signed the verification on her Petition for Dissolution of Marriage after speaking with Jerry for 27 minutes (according to her telephone records) three days earlier.

48.     On May 4, 2005, according to her telephone records, Ms. Williams spoke with Mr. Williams for 40 minutes.  The following day, Ms. Williams spoke with Mr. Williams' attorneys, Hearne & Browder, for 61 minutes, followed by a 51 minute telephone call to Mr. Williams.

49.     On May 6, 2005, Ms. Williams filed a Petition for Dissolution of Marriage against Mr. Williams in the District Court of Tulsa County, Oklahoma, Case No. FD-2005-1806.  Over the next 25 days, Ms. Williams had numerous telephone communications with Mr. Williams and his attorneys, Hearne & Browder, who did not represent Mr. Williams in the divorce.

50.     On May 24, 2005, Ms. Williams' attorney filed a Waiver of Service and Time to Plead signed by Mr. Williams in St. Maarten.

51.     On May 31, 2005, an agreed Decree of Dissolution of Marriage (the "Divorce Decree") was entered dissolving the marriage and dividing the couple's property.  The property division was drafted by Ms. Williams' attorney Mark Lassiter entirely from information provided by Ms. Williams.  Schedules "A" and "B" to the Divorce Decree were also provided to Mark Lassiter by Ms. Williams.  The Divorce Decree was signed by Ms. Williams and her attorney and by Mr. Williams in St. Maarten, who remained *pro se*.  Mr. Williams initialed each page of the decree as well as all of the numerous pages of exhibits describing the property being divided.

52.     According to Ms. Williams' telephone records, from May 6, 2005 (divorce petition date) to May 31, 2005 (divorce decree date), Ms. Williams spoke with Mr. Williams a total of 35 times for a total of 481 minutes, and spoke with Mr. Williams' arbitration attorneys Hearne & Browder a total of 31 times for a total of 418 minutes.

53.     In May 2005, Mr. and Mrs. Williams had $220,980 in their various separate bank accounts ($176,394 in Ms. Williams' and $44,586 in Mr. Williams').

54.     In May 2005, the couple owned two parcels of real property in Tulsa County, Oklahoma with a total assessed value of $292,400.  The evidence before this court suggests that a third parcel located on S. Carson in Tulsa, Oklahoma was Ms. Williams' separate property. Accordingly, the court does not consider the S. Carson property in its fraudulent transfer analysis.  However, it should not be considered that the court makes any finding of separate property that may be used for the purposes of res judicata or collateral estoppel.

55.     The evidence before this court is that the song catalogue identified in the May 31, 2005 Divorce Decree as "Schedule B" had an estimated value of $50,000 at the time of the divorce

according to Steve Lewis, President of Stage Three, Ltd., in his letter to Ms. Williams dated February 7, 2008.

56.     The evidence shows that in May 2005, the couple had horses valued at $202,500.

57.     The evidence shows that in May 2005, the couple had automobiles, a horse trailer, and the boat known as *"The Urge"* with a combined value of at least $347,825.

58.     The evidence shows that in May 2005, the couple owned other assets including a recording studio and music equipment, furniture, jewelry and art, all located at their Leonard, Oklahoma, residence.  The value of those assets were undetermined as of May 2005.

59.     The evidence shows that in May 2005, the couple had mortgage indebtedness on the Leonard, Oklahoma residence in the amount of $140,477.  The evidence shows that in May 2005, Mr. Williams and arguably Ms. Williams had additional liabilities including the Hamstein claim of at least $564,162.00, a lien for unpaid rent of $25,000.00 on the "Brooke Estate"[1] in St. Martin, French West Indies, and Dock fees of at least $13,000.00 for the "Urge", all of which totaled $602,162.00.

60.     The court finds that Mr. Williams was very ill with liver problems when he moved to the islands.  Mr. Williams health deteriorated in 2005.  Mr. Williams wished to provide for his family to the extent he could, and, in the event of his death, Mr. Williams wished to impede Hamstein from collecting monies that Williams wished to go to Ms. Williams.

61.     The evidence shows that the agreed property division in the May 31, 2005, consent divorce awarded Mr. Williams assets with a total value of $269,586 and awarded Ms. Williams assets with a total value of $850,218, both free of pending liabilities.  If the mortgage on the Leonard residence is subtracted from Ms. Williams' awarded assets and the Hamstein claim, the

---

[1] The Brooke Estate is a villa on 30 acres in St. Martin owned by former U.S. Senator from Massachusetts Edward Brooke and his wife.  Mr. Williams rented the property for a time.

Brooks lien and the dock fees are subtracted from Mr. Williams' awarded assets, Ms. Williams' net agreed divorce property award was $709,642 and Mr. Williams' net agreed divorce property award was a <u>negative</u> $334,576.

62.     The evidence shows that following the May 31, 2005, consent divorce, Mr. Williams was unable to pay his debts in the ordinary course of his affairs and his liabilities exceeded his assets. Mr. Williams was cash poor, illiquid, and technically insolvent.  This court finds that after the divorce, Mr. Williams "had basically no income, no money . . .," as testified by Carl Vaughan. Williams lived on his broken-down yacht, was behind on his dock fees, and no longer lived in the Edward Brooke estate.  Williams asked friends to buy his car, his jet ski, and his boat.  He asked friends if he could borrow money.  Many of Williams' friends tried to stay away from him as a result.

63.     Ms. Williams had no reason to believe that Mr. Williams had any other significant assets such that he would be solvent after the transfer of property through the Decree of Divorce.

64.     The court concludes that both Mr. and Mrs. Williams wanted a divorce.  Three witnesses (Ferraro, Ward and Vaughan) testified, and this court finds, that Jerry and Lorelei had a "love-hate" relationship.  Even after the divorce, Jerry checked in on Lorelei frequently.  The telephone records verify frequent phone calls; Jerry's friend Carl Vaughan testified "It was my feeling that he checked in with Lorelei pretty much every day."  Ferraro testified, and this court finds, that if somebody had to get Jerry's assets, Williams preferred that Lorelei, rather than Ham, receive them.  This court finds that Jerry Williams intended to use the divorce to hinder, delay, or defraud Hamstein as Jerry's creditor from reaching Jerry's assets, including his remaining song rights.

65.     Based on her knowledge of the $500,000 Default Judgment, the then-pending arbitration and the remarks of Judge Sparks at the March 4 hearing, Ms. Williams knew and intended that the division of property in the Decree of Divorce would operate to hinder, delay and defraud Hamstein's effort to collect the Default Judgment and the ultimate Judgment relating to the arbitration.

66.     On June 7, 2005, the final hearing in the arbitration between Mr. Williams and Hamstein took place in Austin, Texas.  Mr. Williams did not appear, but was represented by his attorney Paul Browder.

67.     That same day, June 7, 2005, Mr. Williams emailed Gary Roth of Broadcast Music, Incorporated ("BMI").  The stated "Subject" of the email was "Re: DIVORCE DECREE WITH LORELEI WILLIAMS."  The email stated, in pertinent part:

> **I gave her all my rights from BMI and ASCAP over a year ago [sic], as part of our divorce agreement!  But she agreed to let the monies be paid to the Corporation I work for in Anguilla and Sint Maarten, where I now reside!  To receive all the monies owed! . . . [s]he agreed to let all the income from BMI and ASCAP to still come to the same address you have now, but in the Corporate name from now until further notice!** . . . Please let me know that there will be no interruptions of these monies paid to the address you currently have of:
> "The Mailbox" Palapa Center, Bldg. #30 Unit #A, Airport Blvd.
> Sint Maarten, Netherlands Antilles
> The only change will be from my name Jerry Lynn Williams to the Corporate name of:  Platinum Parrot Corporation!  [emphasis added]

68.     On June 23, 2005, the arbitrator entered a final Arbitration Award in favor of Hamstein and against Mr. Williams in the total amount of $1,149,140.19.  The arbitration award included the sanctions previously entered but did "not include any attorneys' fees inasmuch as the sanctions, in addition to being a penalty for discovery abuse were awarded to compensate claimants for attorneys' fees."

69.    On August 16, 2005, Ms. Williams filed an Application for Order Nunc Pro Tunc in the divorce proceeding to include four additional song titles to Schedule B, as part of the song catalogue transferred under the divorce decree. No order was entered approving the application.

70.    On September 23, 2005, a Final Judgment was entered in favor of Hamstein by the United States District Court for the Western District of Texas in the amount of $564,162.51 with interest at 3.82% per annum until paid, and for costs of the suit.

71.    Mr. Williams and Hamstein appealed the federal court judgment in separate appeals. Mr. Williams failed to post a supersedeas bond, and the federal court judgment was not stayed on appeal.

72.    Around Thanksgiving 2005, Peter Ferraro, Esq., an Austin attorney, visited Williams on his yacht in St. Maarten. Williams told Ferraro that Hamstein's judgment would not be honored in the islands.

73.    Mr. Williams was found dead on board his yacht on November 25, 2005, while docked at the Princess Yacht Club at Port de Plaisance, Cole Bay, St. Maarten, Netherlands Antilles.

74.    Ms. Williams initiated a probate case on March 23, 2006 in the District Court of Tulsa County, Oklahoma, Case Number PB-2006-254.

75.    Mr. Williams' former attorney Keithley Lake testified that after Mr. Williams' death, Ms. Williams told him that Mr. Williams had decided to give her the song books as a way of protecting them in the divorce, and that the divorce proceeding and the transfer of assets was part of a plan to protect the assets. The Court notes, however, that the 94 songs listed in Schedule "A" of the divorce decree largely overlap with the 83 songs Mr. Williams had previously

assigned to Stage Three Music in June of 2003.[2]  The same does not appear to apply to the songs listed in Schedule "B" of the divorce decree.[3]

76.     Lake further testified that Lorelei explained the transfer of Jerry's songs and his interest in marital property located in the United States by saying that was what Jerry wanted to do, so he could deal with his "issues," the "issues" being "the ongoing saga with Hamstein and his group."

77.     On January 30, 2006, Hamstein filed suit against the Estate of Jerry Williams and Lorelei alleging claims of violation of the Uniform Fraudulent Transfer Act, OKLA. STAT. tit. 24, §§ 112-123 and common law fraud.  This court previously granted Ms. Williams' Motion for Partial Summary Judgment on Plaintiff's Cause of Action for Common Law Fraud, as Hamstein's allegation that the Williams practiced fraud on the domestic division of the Tulsa County District Court should be directed to the court that entered the judgment allegedly procured by fraud.  *See* Opinion and Order at Dkt. # 126.

78.     Upon invitation from the Tulsa probate court, Hamstein and Jerry's daughters Lynn Michelle Williams Harris and Christian Lynnette Williams agreed that Robert S. Farris, Esq., a practicing probate attorney and former probate Judge, should be submitted to the probate court for appointment as personal representative of the Estate of Jerry Lynn Williams, deceased.  The District Court of Tulsa County, Oklahoma, upon receiving Mr. Farris' Oath, appointed him on February 23, 2007 to serve as personal representative of the Estate of Jerry Lynn Williams, deceased and issued Letters of Administration.  On August 25, 2008, the probate court appointed Robert Farris as Special Administrator of the Estate of Jerry Lynn Williams, deceased.

---

[2] Neither party placed any value on the songs in Schedule "A," and neither does this court for UFTA purposes.
[3] The parties valued the Schedule "B" songs at $50,000 at the time of the divorce decree, as does this court in its analysis of reasonably equivalent value.

79.     Robert Farris was served with summons and has filed an Answer to Hamstein's

Complaint.  Farris testified that, based upon his subsequent investigation, he later filed an

Amended Answer which states in ¶ 27:

> On information and belief regarding the allegations set forth in ¶ 27 of the
> Complaint, the Personal Representative admits that during the later years of his
> life, Jerry Lynn Williams ("the Decedent") specifically intended to hide, conceal
> and secrete his assets from the Plaintiffs to avoid payment of any and all lawful
> debts to which he may be obligated thereon, including the arbitration award of the
> Plaintiffs. The Personal Representative is without specific knowledge of
> Decedent's intent to transfer his property interests memorialized in the Decree of
> Divorce in order to shield his assets from the Plaintiffs or that the transfers were
> made without receiving a reasonably equivalent value in exchange and cannot
> therefore admit or deny the same. Provided, however, the Personal Representative
> alleges and states upon information and belief that the Decedent's transfers
> memorialized in the Decree of Divorce appear to have been made in the
> furtherance of his specific intent to hide, conceal and secrete his assets from the
> Plaintiffs to avoid payment of any and all lawful debts.

Mr. Farris confirmed the positions taken in his Amended Answer during his trial testimony.

80.     Mr. Farris conducted an investigation to determine the assets available for distribution

from the Estate.  Mr. Farris was able to trace the vast majority of the cash proceeds from the

March 2000 settlement with Hamstein and the Stage Three cash payment of June 2003 through

various bank accounts.  Mr. Farris was in the process of selling the yacht.  Mr. Farris was unable

to locate any sale proceeds from the Thunderbird automobile, the Harley Davidson motorcycle or

the Wave-Runner, nor was he able to locate these items of property.


## CONCLUSIONS OF LAW

1.      Hamstein's action is brought pursuant to the Oklahoma Uniform Fraudulent Transfer Act,

OKLA. STAT. tit. 24, § 112-123. (the "UFTA").

2.      As reflected on page 4 of the Amended Pretrial Order, this court ruled prior to trial after

considering briefs filed by the parties that Hamstein's burden of proof in this UFTA action under

Oklahoma law is preponderance of the evidence. Dkt. ## 286, 289; *In re Solomon*, 300 B.R. 57, 63 (Bankr. N.D. Okla. 2003).

3.      Ms. Williams attempted to raise "good faith for value" as an affirmative defense in Section I of the Amended Pretrial Order. The affirmative defense was raised at the last minute prior to trial, and was therefore untimely. Therefore, the court did not permit the affirmative defense to be included in the Amended Pretrial Order. However, as the court discussed with counsel on the record on the first and second days of trial, the court was uncertain whether striking "good faith for value" as an affirmative defense took the issue entirely out of play. The court asked counsel to think about the issue and did not bar evidence at trial with respect to "good faith for value." *See* Tr,, Vol. I,  p. 33, ln. 19 to p. 36, ln. 3, and Vol. II, p. 201, ln. 20 to p. 202, ln. 5; OKLA. STAT. tit. 24, § 120 (A) and (D). Defendants asserting a good faith defense bear the burden of proving their good faith. *See In re Tiger Petroleum Co.*, 319 B.R. 225, 236 (Bankr. N.D. Okla. 2004). Good faith must be established using an objective standard and is primarily an issue of fact. *In re Tiger Petroleum*, 319 B.R. at 235; *In re M & L Business Mach. Co., Inc.*, 84 F.3d 1330, 1338 (10th Cir. 1996). Under the objective standard, "if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and if a diligent inquiry would have discovered the fraudulent purpose, then the transfer is fraudulent." *In re Tiger Petroleum*, 319 B.R. at 235, quoting *In re M & L Business Mach. Co., Inc.*, 84 F.3d at 1338. To the extent the "good faith for value" defense might properly be considered, this court finds that Ms. Williams failed to meet her burden with credible evidence.

4.      Under Oklahoma law, a creditor may collaterally attack a divorce decree where the creditor's interests, which accrued prior to the decree, have been adversely affected. *Dowell v. Dennis*, 998 P.2d 206 (Okla. Civ. App. 2000). "Special scrutiny is applied to transfers between

spouses where the debtor spouse is thereby rendered insolvent and unable to satisfy the claims of his creditors. . . . The incorporation of the parties' agreement into a judicial decree does not alter this result. While judicial approval in such circumstances may represent a determination that the agreement is fair and equitable as between the parties to the divorce, it does not represent a determination that the agreement perpetrates no fraud upon the creditors of one spouse." *Id.*, citing *Kardynalski v. Fisher*, 482 N.E.2d 117, 122 (Ill. App. 1985). The Court may properly value the marital estate and assets transferred under the UFTA as of the date of the transfer through the divorce decree.

5.      No specific determination is required by this Court of the respective marital interests in the Williams' marital estate, to which Mr. and Mrs. Williams may be or may have been entitled, in order to rule on Hamstein's UFTA claim.

6.      Mr. Williams' interest in the marital homestead properly ceased to be a homestead interest when he left Tulsa County and moved his principal residence to the island of St. Martin/St. Maarten in June 2003. OKLA. STAT. tit. 31, § 1(A)(1). The transfer of Mr. Williams' interest in the real property in the decree may be avoided, but the home may be subject to Ms. Williams' exemption and other defenses not raised in this UFTA action.

7.      This Court concludes that the transfers made in the Decree of Divorce were fraudulent pursuant to OKLA. STAT. tit. 24, § 116 (A)(1) and (B). There is direct evidence of Mr. Williams' intent, pursuant to OKLA. STAT. tit. 24, § 116 (A)(1) in the form of his own emails to his lawyers Keith Ward, Esq. and Keithley Lake, Esq., to BMI attorney Gary Roth, Esq., and testimony from his lawyers and friends recounting conversations with Mr. Williams, that Mr. Williams intended to hinder, delay and defraud Hamstein by transferring most of his assets to Ms. Williams through the Decree of Divorce.

8.     In addition to the direct evidence of Mr. Williams' fraudulent intent, this Court finds that indirect evidence of intent exists pursuant to OKLA. STAT. tit. 24, § 116 (B) in the presence of the statutory badges of fraud:

a.     Mr. Williams' transfer of his assets in the consent divorce was to Ms. Williams, an insider for purposes of the UFTA.  *In re Lindley*, 121 B.R. 81 (Bkrtcy. N.D. Okla. 1990).

b.     Mr. Williams understood he would retain and attempted to retain possession or assert control of portions of the property transferred in the consent divorce after the transfer on May 31, 2005, in particular, the income stream from BMI and ASCAP.

c.     Although the divorce action and Decree of Divorce were in the public record, Mr. Williams' transfer of his assets was not disclosed to Hamstein and Hamstein did not learn of the asset transfer or of the divorce until after Mr. Williams' death.

d.     Before the asset transfer, Mr. Williams had not only been threatened with suit, but a Default Judgment in the amount of $500,000 had been entered against him and a federal judge had decided not to set it aside.  Moreover, the arbitration remained pending, together the threat of an additional award against Mr. Williams.

e.     Mr. Williams subsequently transferred substantially all of his assets to Ms. Williams in their consent divorce.

f.     Mr. Williams moved his principal and only residence to St. Martin/St. Maarten island in the Caribbean in an effort to shield his assets from Hamstein.

g.     Mr. Williams attempted to conceal and/or shield assets from Hamstein by creating Platinum Parrot and transferring his assets to that Anguillan offshore company.

h.     The value of the consideration received by Mr. Williams in the consent divorce from Ms. Williams was not reasonably equivalent to the value of the assets transferred to Ms.

Williams in the property settlement accomplished in their consent divorce. *In re Commercial Financial Services*, 350 B.R. 559, 576 (N.D. Bankr. 2005).

i.     Following the transfer of his assets in the consent divorce on May 31, 2005, Mr. Williams was insolvent.

j.     The asset transfer occurred just over three months after Hamstein's $500,000 Default Judgment was entered and just over three weeks before Hamstein received a $1,149,140.19 final Arbitration Award against Mr. Williams.

9.     Additionally, this Court finds that the asset transfer made in the Decree of Divorce was fraudulent pursuant to Okla. Stat. tit. 24, § 116 (A)(2) as Mr. Williams did not receive reasonably equivalent value in exchange for the transfer and Mr. Williams knew that he would incur debts beyond his ability to pay as they came due.

10.     "Reasonably equivalent value" is derived by examining the totality of the circumstances underlying the challenged transfer. *In re Commercial Financial Services*, 350 B.R. 559, 576 (N.D. Bankr. 2005). When viewed from his creditors' standpoint, as required under the UFTA, Mr. Williams did not receive the "reasonably equivalent value" of assets from the transfer in the consent divorce. *In re Commercial Financial Services*, 350 B.R. 559, 578 (N.D. Bankr. 2005).

11.     After considering the totality of the circumstances surrounding the transfer of assets in the consent Decree of Divorce, pursuant to the testimony and documentary evidence submitted during the non-jury trial, the Court concludes a Judgment should be entered in favor of Hamstein and against Ms. Williams and Mr. Williams' Estate

12.     The Court finds and concludes that Mr. Williams's transfer of assets pursuant to the Decree of Divorce was a fraudulent transfer as defined in the Uniform Fraudulent Transfer Act

and hereby sets aside, vacates, annuls, and avoids all the transfers made thereunder as necessary to satisfy creditors' claims.

13.     The Court finds and concludes that the determination of respective property rights and interests between Mr. Williams' Estate and Ms. Williams resulting from this decision shall be made in accordance with the laws of Oklahoma before the appropriate Division of the Tulsa County District Court.

WHEREFORE, the Court hereby enters these Findings of Fact and Conclusions of Law and enters a separate Judgment in favor of plaintiffs and against defendants Estate of Jerry Lynn Williams and Lorelei Williams.

IT IS SO ORDERED this 30th day of September, 2011.


Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma